# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**Longview Power, LLC, et al.,**[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 13-12211 (BLS)<br><br>Jointly Administered |
| **Longview Power, LLC, et al.,** and<br><br>**MUFG Union Bank, N.A., a nominal plaintiff, solely in its capacity as first-lien asset collateral agent under the Longview Credit Agreement,**<br><br>Plaintiffs,<br><br>v.<br><br>**First American Title Insurance Co.**<br><br>Defendant. | Adv. No. 14-50369<br><br>Related to Adv. Docket Nos. 10, 21 & 35 |

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification number are: Longview Power, LLC (1860); Longview Intermediate Holdings C, LLC (1008); Mepco Holdings, LLC (6654); Mepco Intermediate Holdings A, LLC (0502); Mepco Intermediate Holdings, LLC (4248); Mepco, LLC (3172); Coresco, LLC (6397); Dana Mining Company of Pennsylvania, LLC (8721); Dana Mining Company, LLC (4499); Mepco Conveyor, LLC (0477); Shannopin Materials, LLC (1616); Border Energy, LLC (2798); and Alternate Energy, LLC (2428).

# MEMORANDUM ORDER[2]

Upon consideration of the Motion Pursuant to Local Rule 5011-1 to Determine Core/Non-Core Status (the "Motion") [Adv. Docket No. 10] filed by defendant First American Title Insurance Co. ("First American"); the response to the Motion (the "Response") [Adv. Docket No. 21] filed by the Plaintiffs; and the reply [Adv. Docket No. 35] filed by First American; and following a hearing on the matter; and after due deliberation, the Court hereby FINDS as follows:

## A. Background

1. The Debtors filed the Complaint [Adv. Docket No. 1] in this adversary proceeding on May 23, 2014. The First Amended Complaint (the "Amended Complaint") [Adv. Docket No. 19] was filed July 3, 2014, to add MUFG Union Bank, N.A., as a nominal plaintiff, solely in its capacity as first-lien asset collateral agent under the Longview Credit Agreement, as defined herein, and the contemporaneous collateral agency and intercreditor agreement (in such capacity, the "Collateral Agent").

2. The Debtors operate an integrated power generation enterprise, through two distinct business units: 1) Longview, which was formed for the purpose of constructing and operating a 700 net megawatt supercritical coal-fired power plant in Maidsville, West Virginia (the "Power Plant"), and 2) Mepco, which is a vertically integrated coal miner and processor with facilities located in southwestern Pennsylvania and northern West Virginia.

3. Construction on the Power Plant began in 2007 and was funded, in part, by debt totaling approximately $1.2 billion. The Debtors obtained the funds pursuant to that certain credit agreement, dated as of February 28, 2007, as amended and restated June 20, 2011, and as further amended from time to time (the "Longview Credit

---

[2] This Memorandum Order constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

Agreement"). The lenders under the Longview Credit Agreement (the "Longview Lenders") received first priority liens on substantially all of the Debtors' assets, including the Power Plant, to secure their loans. In connection with the Debtors' entry into the Longview Credit Agreement, on March 9, 2007, First American issued a policy of title insurance, policy number A40008468 (the "Title Insurance Policy") to the Collateral Agent for the benefit of the Longview Lenders in the amount of $825 million. None of the Debtors is a party to the Title Insurance Policy.

4. Longview Power, LLC, entered into contracts with Siemens Energy, Inc. ("Siemens"), Kvaerner North American Construction, Inc. ("Kvaerner"), and Foster Wheeler North America Corporation ("Foster Wheeler") (collectively, the "Contractors") for the design, supply, construction, and commissioning of the Power Plant. The Debtors took over the Power Plant in December 2011, and shortly thereafter the Contractors asserted mechanics' liens on the Power Plant and related properties (the "Mechanics' Liens"). On February 8, 2012, Kvaerner asserted mechanics' liens in the aggregate amount of $242.2 million; on February 17, 2012, Siemens asserted mechanics' liens in the aggregate amount of $93.5 million; and Foster Wheeler asserted mechanics' liens in the aggregate amounts of $8.8 million on February 23, 2012, and $14.9 million on May 10, 2012. The Contractors contend that the Mechanics' Liens are senior to any liens securing claims arising under the Longview Credit Agreement with respect to the Power Plant and related properties; the Longview Lenders dispute this contention.

5. The Debtors have asserted their own substantial claims against the Contractors. The Debtors allege that the Power Plant has suffered from extended planned outages, additional unscheduled outages, generation derating, and the need for material repairs. As a result, the Debtors state that they have been unable to operate the Power Plant at full capacity and have been limited to selling electricity on a day-ahead basis. The Debtors blame the Contractors for these shortcomings in the operation and performance of the Power Plant. In order to resolve the issues between them, in 2011 the Debtors and the Contractors entered into an arbitration proceeding, *Kvaerner North*

*American Construction, Inc., and Siemens Energy, Inc. v. Longview Power LLC and Foster Wheeler North America Corp.*, AAA Case No. 50 158 T 00411 11 (the "Arbitration").

6.  In addition to the operational challenges described above, the Debtors also face significant market pressures: there has been a drop in both wholesale electricity prices and demand for electricity since construction on the Power Plant commenced in 2007, and a drop in wholesale coal prices. Each of these factors has adversely affected the Debtors' business plan and strategic optionality. The Debtors began considering restructuring options in 2012, and ultimately filed voluntary Chapter 11 petitions on August 30, 2013 (the "Petition Date").

7.  In conjunction with their bankruptcy petitions, the Debtors filed a cash collateral motion [Docket No. 25], in which they indicated an intent to promptly draw on $59 million of letters of credit, which were posted by Foster Wheeler in favor of Longview Power, LLC (the "Foster Wheeler LCs").[3] The Contractors vigorously disputed the Debtors' right to draw on the LCs. On November 15, 2013, the Court entered an agreed order [Docket No. 463] lifting the automatic stay to allow the Arbitration to proceed with respect to all issues except the Foster Wheeler LCs, extending the expiration date of the Foster Wheeler LCs, and prohibiting the Debtors from drawing on the Foster Wheeler LCs until further order of the Court.

### B. The Original Plan

8.  Meanwhile, throughout the fall of 2013, the Debtors and holders of approximately sixty (60) percent of the debt outstanding under the Longview Credit Agreement (the "Backstoppers") engaged in negotiations for a consensual chapter 11 process. The Debtors and the Backstoppers agreed on the terms of the Debtors' first proposed

---

[3] The Foster Wheeler LCs are comprised of two letters of credit from BNP Paribas, one numbered 91895015 in the amount of $39,800,000 and the other numbered 91895023 which was in the amount of approximately $19 million at the time of the Petition Date.

plan of reorganization (the "Original Plan"), which contemplated a debt-for-equity transaction by which the holders of claims arising under the Longview Credit Agreement would exchange their debt for the majority of the equity in the reorganized Debtors. The plan required that the Debtors obtain entry of an order from the Court estimating the Mechanics' Liens at $0.00 for all purposes (including distribution). The Debtors filed a motion to estimate the Mechanics' Lien claims [Docket No. 582] on December 11, 2013, and the Contractors filed objections to the estimation motion [Docket Nos. 721, 724 & 728].

9. On December 18, 2013, the Court entered an order [Docket No. 663] approving, *inter alia*, the Debtors' disclosure statement [Docket No. 672] and authorizing the Debtors to solicit votes on the Original Plan. The Debtors initially set a hearing to confirm the Original Plan for February 11, 2014. Since February 2014, the Debtors, in consultation with the Backstoppers, have elected to adjourn the claims estimation process and the confirmation process for the Original Plan.

10. The Debtors have continued to engage in negotiations with the Backstoppers and the Contractors regarding a consensual resolution to these chapter 11 cases, including participating in a mediation ordered by the Court on March 6, 2014 [Docket No. 1012]. The Debtors reached a significant settlement with Foster Wheeler, whereby Foster Wheeler agreed to release its Mechanics' Lien claims and perform certain work on the Power Plant. The settlement was approved by the Court on March 7, 2014 [Docket No. 1018] over the objections of Kvaerner and Siemens.

### C. The Amended Plan

11. Following the settlement with Foster Wheeler, the Debtors proposed a first amended plan of reorganization (the "Amended Plan") [Docket No. 1139]. The Amended Plan takes a different tack with respect to the Contractors' Mechanics' Lien claims, and instead of estimation contemplates that the remaining Mechanics' Lien claims by Kvaerner and Siemens will be covered by proceeds from the Title Insurance Policy. In order to achieve this, the Amended Plan provides for an agreement with the Collateral Agent for an assignment

of certain cash proceeds from the Title Insurance Policy (but not the policy or the claim itself) by the Collateral Agent to a trust formed by the Debtors for the benefit of Kvaerner and Siemens. The Amended Plan further requires that the Debtors obtain a determination that coverage exists under the Title Insurance Policy for the losses the Longview Lenders will incur if the Mechanics' Liens are determined to be valid and senior to the liens securing the claims arising under the Longview Credit Agreement. The Debtors argue that their interest in proceeds from the Title Insurance Policy is therefore critically important to the reorganization.

12. On May 16, 2014, First American filed a complaint against the Collateral Agent in the Superior Court of Orange County, California, Case No. 30-2014-00723753-CU-IC-CXC (the "State Court Action") to determine coverage under the Title Insurance Policy and asserting certain bars to coverage. On May 23, 2014, the Debtors filed a motion to enforce the automatic stay, or in the alternative, for preliminary and permanent injunctive relief (the "Stay Motion") [Docket No. 1187], in order to halt the State Court Action. As mentioned above, the Complaint in this adversary proceeding was filed the same day.

13. At a hearing on June 10, 2014, the Court granted the relief requested by the Plaintiffs in the Stay Motion. On June 19, 2014, the Court entered an order (the "Stay Order") [Docket No. 1296] pursuant to which the Court found that the State Court Action was subject to the automatic stay under section 362 of the Bankruptcy Code, or alternatively, that the facts and circumstances warranted the extension of the stay to the State Court Action.

14. Following entry of the Stay Order, on June 20, 2014, First American has filed motions in this adversary proceeding seeking to (a) withdraw the reference to the bankruptcy court with respect to this adversary proceeding [Adv. Docket No. 5], (b) determine the proceeding's core/non-core status (the instant Motion), and (c) dismiss or in the alternative asking the Court to abstain from hearing this proceeding [Adv. Docket No. 8]. The Plaintiffs filed their Response to

the Motion on July 7, 2014. The hearing on the core/non-core issue was held on July 31, 2014.

### D. The Parties' Positions

15. In its Motion, First American stresses that the Debtor is not, and will not become, a party to or an insured under the Title Insurance Policy. Because the coverage question is intended to adjudicate the respective rights of a non-debtor insured versus a non-debtor insurer, First American contends that this matter cannot be within this Court's core jurisdiction. Further, First American argues that the Complaint consists of two distinct requests for relief: first, a claim to determine that the proceeds of the Title Insurance Policy are property of the estate under 11 U.S.C. § 541, which First American concedes is core. The second claim, as construed by First American, is a claim to determine that coverage exists under the Title Insurance Policy and that the policy proceeds are available for assignment and distribution in accordance with the Amended Plan, which First American contends is non-core.

16. The Plaintiffs argue that the entire Complaint is a core proceeding under 11 U.S.C. § 541, and that the Complaint can only arise in the context of a bankruptcy proceeding because it is necessary to determine plan feasibility. Plaintiffs point the Court's attention to the assignment of proceeds of the Title Insurance Policy, and note that these proceeds (if realized, and if the Amended Plan is confirmed) represent the largest liquid asset in this case. Where a reorganization plan is built around a particular asset, Plaintiffs contend, legal determinations regarding that asset must fall within the Court's authority.

## Analysis

17. Section 157 authorizes district courts to refer "cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11" to the bankruptcy judges for the district. 28 U.S.C. 157(a). The District Court for the District of Delaware has an

Amended Standing Order of Reference, signed February 29, 2012, referring all such cases to the bankruptcy judges for this district.

18. Upon such referral, § 157 grants the bankruptcy court "'two levels of judicial power, depending upon the type of proceeding before it.'" *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (quoting *In re Marcus Hook*, 943 F.2d 261, 266 (3d Cir. 1991)). With respect to cases under title 11 and core proceedings arising under title 11, or arising in a case under title 11, the bankruptcy court "assumes the role of a court of first instance with comprehensive power to hear, decide and enter final orders and judgments." *Halper*, 164 F.3d at 836 (citing 28 U.S.C. § 157(b)(1)).[4] For proceedings that are not core but that are otherwise related to a case under title 11, or "non-core" proceedings, the bankruptcy court's "adjudicatory power is limited to hearing the dispute and submitting 'proposed findings of facts and conclusions of law to the district court.'" *Halper*, 164 F.3d at 836 (quoting 28 U.S.C. § 157(c)(1)).

19. The Third Circuit Court of Appeals has instructed that two sources must be consulted by courts when determining whether a proceeding is core or non-core. *Halper*, 164 F.3d at 836. First, § 157(b) provides an illustrative but non-exclusive list of proceedings that may be considered core. *Id.* (citing 28 U.S.C. § 157(b)(2)(A)-(O)). The Court observes that this list does not expressly include insurance coverage disputes, but Plaintiffs contend that the catch-all provision in 28 U.S.C. § 157(b)(2)(A) ("matters concerning the administration of the estate") captures the instant litigation. Second, even if a proceeding is not listed, "a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *Halper*, 164 F.3d at 836 (internal citations omitted).

---

[4] There is a limited (and evolving) exception to the bankruptcy court's authority to enter final orders and judgments, where the court lacks the constitutional authority to do so. *See Stern v. Marshall*, 564 U.S. 2 (2011).

20. Non-core proceedings "include the broader universe of all proceedings that are not core proceedings but are nevertheless 'related to' a bankruptcy case." *Halper*, 164 F.3d 830. Where a claim or cause of action is filed prior to confirmation of a plan, "the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (overruled on other grounds); *see also In re MPC Computers, LLC*, 465 B.R. 384, 392 (Bankr. D. Del. 2012).

21. The Third Circuit has also stated that a "single cause of action may include both core and non-core claims" and "[t]he mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'" *In re Exide Technologies*, 544 F.3d 196, 206 (3d Cir. 2008) (citing *In re Best Reception Systems, Inc.*, 220 B.R. 932, 947 (Bankr. E.D. Tenn. 1998)).

22. First American argues that the *Exide* statement applies here, and that the Debtors are attempting to shoehorn a state law insurance coverage claim into a core classification based on § 541, when the inquiry about whether the proceeds of the Title Insurance Policy are property of the estate under § 541 is actually a separate question from the determination that coverage under the policy exists. First American also relies on *In re PRS Ins. Group, Inc.*, 445 B.R. 402 (Bankr. D. Del. 2011) and *In re Stone & Webster, Inc.*, 367 B.R. 523 (Bankr. D. Del. 2007). In *PRS*, the Chapter 11 trustee brought suit on a post-confirmation basis against the debtors' insurer for breach of two reinsurance agreements and bad faith refusal to pay claims. The bankruptcy court determined that the proceeding was non-core, because (i) the action did not involve any specific conduct in the bankruptcy cases, (ii) a number of cases have held that an action by a debtor against its insurer is non-core, and (iii) the dispute was not one which could only arise in the context of a bankruptcy case because the claims arose under state law. *PRS*, 445 B.R. at 404-05.

23. In *Stone & Webster*, successors-in-interest of the Chapter 11 debtors brought suit after plan confirmation against successors-in-interest of the debtors' insurers for breach of contract, breach of an

implied covenant of good faith, and bad faith refusal to pay claims. The bankruptcy court held that the proceeding was non-core because the claims arose prepetition and the issue of determining coverage was a separate question from determining whether the insurance policies were property of the estate. The court rejected the argument that the proceeding was core because it would augment amounts available for distribution to creditors, since "the prospect that a claim may provide economic benefit to the estate does not factor into the determination of whether a claim is core or non-core." *Stone & Webster*, 367 B.R. at 528-29.

24. The Plaintiffs first distinguish *PRS* and *Stone & Webster* on the ground that each of these cases discusses litigation arising after plan confirmation. They next argue that the declaratory judgment action cannot be separated as First American suggests, and that the entire suit is a core proceeding to determine property of the estate under § 541. The Plaintiffs further argue that the suit is necessary to determine plan feasibility, because a coverage determination is required under the Amended Plan, and that First American's coverage defenses are based on actions taken during the course of the bankruptcy cases and therefore only arise in the context of a bankruptcy. The Plaintiffs rely on *In re American Capital Equip., LLC*, 325 B.R. 372 (W.D. Penn. 2005); *In re Reliance Holdings, Inc.*, 273 B.R. 374 (Bankr. E.D. Penn. 2002); and *In re Celotex Corp.*, 152 B.R. 667 (Bankr. M.D. Fla. 1993). In *American Capital Equipment*, the district court held that an insurance coverage dispute between a debtor and its insurer was a core proceeding because it could only arise in the bankruptcy context. *American Capital Equip.*, 325 B.R. at 377. Since the insurer would only be excused from its duty to defend and indemnify the debtor if the debtor's actions in negotiating and formulating a plan of reorganization in the bankruptcy case violated the insurance policies, the coverage dispute would therefore not exist independent of the bankruptcy. *Id.* at 377-78. In *Reliance*, the bankruptcy court determined that an action seeking a declaration that the debtor's subsidiary's assets included certain insurance policies was a core proceeding. *Reliance*, 273 B.R. at 395-96. In *Celotex*, the bankruptcy court held that the debtor's insurance policies and proceeds

were property of the estate, and therefore determining the extent of the debtor's rights under such policies was "equally within the context of § 541." *Celotex*, 152 B.R. at 676.

25. Considering each of these arguments and supporting authorities, the Court finds that the question of whether coverage exists under the Title Insurance Policy is non-core. The bottom line is that the coverage dispute implicates state law rights and defenses as between First American and the Collateral Agent. The policy itself has not been assigned, only the proceeds arising out of losses incurred by the Longview Lenders due to the Mechanics' Liens. The question of whether the potential proceeds are property of the estate is separate from the question of whether First American is obliged to perform under the Title Insurance Policy.

26. Since *Reliance* dealt only with the question of whether policies were property of the estate, *Reliance* does not apply to this case. The reasoning of *American Capital* is also not dispositive because First American asserts that its defenses to coverage are not based exclusively on events that occurred during these bankruptcy proceedings. Additionally, both *American Capital* and *Celotex* can be distinguished on the grounds that the disputes in those cases were between the debtors and their insurers. Here, not only is the dispute between the non-debtor collateral agent and the insurer, but the assignment of proceeds to the Debtors has not even occurred—it will occur only if the Amended Plan is confirmed.

27. The Plaintiffs also argue that the determination of coverage is necessary to establish plan feasibility, because the Amended Plan states that a coverage determination is a condition precedent to confirmation, and therefore the action can exist only in the bankruptcy context. However, the Court can see no limiting principle to this argument and it would give debtors unfettered license to confer core status to proceedings by requiring their favorable adjudication in order to confirm a plan. The Court also agrees with the previously quoted statement by Judge Walsh in *Stone & Webster* that "the prospect that a claim may provide economic benefit to the estate does not factor

into the determination of whether a claim is core or non-core." *Stone & Webster*, 367 B.R. at 528-29.

28. The Court is cognizant of the significance to the Debtors of the dispute over the Title Insurance Policy. The Debtors have formulated the Amended Plan in hopes of successfully concluding a very complex operational and financial restructuring involving billions of dollars in claims and assets. Nevertheless, the immediate question is whether an insurance coverage dispute between an insurer and a non-debtor invokes this Court's core jurisdiction. While it is clearly "related to" these bankruptcy proceedings, the Court concludes that the coverage dispute is a non-core matter.

Accordingly, it is hereby

**FOUND** and **DETERMINED** that the claim for declaratory judgment regarding whether the applicable proceeds of the Title Insurance Policy are property of the Debtors' bankruptcy estates pursuant to 11 U.S.C. § 541 is a core claim, and it is further

**FOUND** and **DETERMINED** that the claim for declaratory judgment regarding the availability of coverage under the Title Insurance Policy is a non-core claim.

**BY THE COURT:**

Dated: August 12, 2014
Wilmington, Delaware

_____
Brendan Linehan Shannon
United States Bankruptcy Judge